## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| PABLO OVIEDO, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 15-344S |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATION**

Patricia A. Sullivan, United States Magistrate Judge

　　Plaintiff Pablo Oviedo is a non-English-speaking man who was forty-six and suffered from an essential tremor, borderline intellectual functioning, a learning disorder and depression/anxiety disorder when he stopped working part-time as a driver for an automobile auction company.  After he stopped working, the tremor worsened to the point where, despite treatment, he could not write or hold objects.  Before the Court is his motion for reversal of the decision of the Commissioner of Social Security (the "Commissioner"), denying Supplemental Security Income ("SSI") under § 1631(c)(3) of the Social Security Act, 42 U.S.C. § 1383(c)(3) (the "Act"), based on errors by the Administrative Law Judge ("ALJ") in her evaluation of both the Plaintiff's credibility and the opinions of his treating psychiatrist and treating nurse practitioner.  Defendant Carolyn W. Colvin asks the Court to affirm the Commissioner's decision.

　　These motions have been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  Having reviewed the entire record, I make the *sua sponte* finding that the ALJ's Step Two determination that Plaintiff's essential tremor did not amount to a severe impairment constitutes error requiring remand.  I also

find that the ALJ's reasons for rejecting the opinions of the treating psychiatrist and nurse practitioner are not supported by substantial evidence. I find further that the adverse finding as to Plaintiff's credibility is not supported by the requisite "specific and adequate reasons." Based on these findings, I recommend that Plaintiff's Amended Motion to Reverse the Decision of the Commissioner (ECF No. 14) be GRANTED and Defendant's Motion for an Order Affirming the Commissioner's Decision (ECF No. 15) be DENIED.

## I.   <u>Background</u>

### A.   **Plaintiff's Relevant Background**

Born in the Dominican Republic, Plaintiff does not speak English. He has a full scale non-verbal IQ in the "very poor" range and ended his education in 9th grade before coming to the United States. Tr. 43, 168, 268. After his mother's 2003 death in New York, Plaintiff moved to Rhode Island where he has been homeless, largely friendless[1] and isolated from family. Tr. 279. Until 1996, Plaintiff worked for asbestos removal companies with peak annual income of $15,000 in one year; since 1996, his income has been negligible. Tr. 145-56. What little reported income he earned was from driving for an automobile auction company. Tr. 44, 145-56. Although his alleged onset date is January 1, 2011, he continued to work as a part-time driver until November 30, 2011, when he stopped working for good.[2] Tr. 160. He has provided two different explanations for why he stopped work: he told the ALJ he stopped because his "back"[3] started to hurt and [he] had to walk a lot[, . . . he] was feeling poorly and also all that, all

---

[1] Treating records consistently reflect that Plaintiff had "no friends," Tr. 279-80, until mid-2013, when his psychiatrist noted at appointments in May and July 2013 that he had spent "time with friends." Tr. 373, 381. At the hearing, Plaintiff testified that he has no friends. Tr. 47.

[2] Working as a driver did not yield enough income to amount to "SGA" ("substantial gainful employment"). Tr. 157.

[3] Plaintiff complained about back pain during the hearing and in his Function Report. Tr. 45, 175. As the ALJ correctly noted, the medical record makes almost no reference to back pain and none to treatment for back pain. Tr.

those people, the crowds made me feel panic attacks," Tr. 45, while in his application, he said he

stopped work because he did "not have transportation." Tr. 169. Plaintiff was forty-six when he

stopped working. Tr. 43, 136.

Both treating providers and Social Security Administration ("SSA") experts and staff

have observed that Plaintiff's ability to describe his symptoms and recount his history is very

limited. See, e.g., Tr. 158 (field office interviewer notes "difficulty remembering dates, work

history"); Tr. 231 (Nurse May notes, "[h]e is a difficult historian"); Tr. 266 (consulting

psychologist Dr. Armesto notes Plaintiff is "a fair to poor informant"); Tr. 279 (Providence

Center initial assessment notes, "[h]e seems to have some struggles articulating the [long hx of

self-reported pxs with nervousness] with regard to precise sxs, triggers, durations, etc"); Tr. 286-

87 (Dr. Husain notes that Plaintiff is "very vague about his symptoms").

### B.    Plaintiff's Medical History

Plaintiff appears to have gone to the Providence Community Health Center ("PCMC")

for most of his health needs throughout the period of alleged disability.[4]  Much of the care was

provided by a nurse practitioner, Catherine May, while his primary care physician initially was

Dr. Hina Lone and later, from July 2013, Dr. Rachel Epstein. At PCMC, Plaintiff was treated for

hypertension, smoking cessation, the essential tremor and his mental health issues, including

insomnia, depression and anxiety. The seriousness of his mental health issues resulted in a

referral to the Providence Center in July 2011, where he was treated by a psychiatrist, Dr. Reema

Husain, and a Spanish-speaking therapist, Enrique Gonzalez. After the referral, his primary

---

28.  Plaintiff does not challenge the ALJ's rejection of back pain as a severe impairment at Step Two.  It will not be
mentioned further in this report and recommendation.

[4] The earliest PCMC record is from July 2011 and is virtually illegible.  Tr. 256.  However, it appears to reflect that
this was not Plaintiff's first appointment; rather, he was returning in connection with ongoing treatment, including
the prescription of medication to treat his essential tremor, depression, anxiety and insomnia.  Tr. 256-57.

PCMC treating providers (Dr. Lone, Dr. Epstein and Nurse May) continued carefully to monitor his mental health status.

The only material physical impairment, the essential tremor, is mentioned in Nurse May's treating notes from 2011 and 2012.  To the extent that the records are readable, they describe the essential tremor as a condition that was "active" but "intermittently observed" and for which propranolol was prescribed.  Tr. 221, 245-58.  Nurse May's 2012 notes are focused on the seriousness of Plaintiff's mental health issues and mention the tremor only as a condition that was being assessed.  Tr. 221, 229-34, 238-46.  Serious attention to the tremor is not reflected in any treating record until September 2013, when the therapist, Mr. Gonzalez, noted that Plaintiff reported "some trembling hands lately"; Mr. Gonzalez advised Plaintiff that he should consult Dr. Epstein about it.  Tr. 388.  The consultation occurred in October 2013; Dr. Epstein noted a bilateral longstanding tremor (for as long as Plaintiff can remember, into childhood) that had been gradually worsening "to the point that he has difficulty writing and holding objects now." Tr. 421-22.  At the next appointment, in November 2013, Dr. Epstein recorded that the propranolol was not helping the tremor at all; she noted that, when Plaintiff spoke vaguely of his "nervios" being bad, he was referring to the tremor.  Tr. 416.  She also recorded Plaintiff's report that he burned himself with hot chocolate spilled because of his trembling hands.  Tr. 416.  At an appointment in December 2013 (the last in the record), the tremor was unresolved: Dr. Epstein noted that it was "a little better with increased proprandol," but was "still present," and that occupational therapy should be considered.  Tr. 407-08.

Plaintiff's mental impairments were closely followed by both PCHC treating providers and by the psychiatrist and therapist at the Providence Center.  The earliest readable record is PCMC Nurse May's note of April 6, 2012, which recorded serious subjective and objective

observations of mental health issues, as well as the upcoming (in July) appointment to initiate

treatment with a psychiatrist at the Providence Center.  Tr. 238-41.  Subjectively, Plaintiff

reported, "experience[ing] anxiety and depression despite robust dose of SSRI and Trazodone."

Tr. 238.  On neurological and psychological examination, Nurse May recorded that Plaintiff's

concentration was decreased and that he was restless or fidgety, moving or speaking slowly, had

anxiety with persistent worry, depression with feelings of hopelessness, sleep disturbance,

anhedonia and low self-esteem.  Tr. 238-39.  On mental status examination, Nurse May recorded

dysthymic and anxious mood, abnormal and quiet affect, and impaired thought content with

symptoms of obsessive-compulsive disorder.  Tr. 238-39.  She continued prescriptions for Zoloft

and Trazodone.  Tr. 240.  At a June 2012 appointment, she added night-time eating and weight

loss to the list of psychological issues; noting that he was experiencing dizziness, she wrote that

he "has been unable to ride his bicycle, his main exercise and transportation."  Tr. 231.

Psychiatric treatment at the Providence Center began on July 30, 2012.  Tr. 279.  The

mental status examination performed during the initial assessment noted constricted affect and

feelings of inadequacy/worthlessness, with passive suicidal ideation, but that his motor

functioning, speech, thought processes, perception, sensorium, attention/concentration, memory,

intellectual functioning, judgment, and insight were all intact.  Tr. 282-85.  The examiner

diagnosed adjustment disorder with depressed mood and anxiety disorder, and assigned a Global

Assessment of Functioning ("GAF") score of 45, denoting serious symptoms or impairment.  Tr.

284-85.[5]  Plaintiff began therapy with Mr. Gonzalez, whose mental status examinations

consistently noted abnormalities of mood and often speech.  Tr. 288-99.  In November 2012, a

---

[5] Under the now-disfavored GAF scale, scores in the 41-50 range signify serious symptoms *or* any serious impairment in social or occupational functioning.  Am. Psychiatric Assoc., Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV").  In May 2013, the American Psychiatric Association removed GAF scores from the DSM due to their "conceptual lack of clarity" and "questionable psychometrics in routine practice."  See Am. Psychiatric Assoc., Diagnostic & Statistical Manual of Mental Disorders 16 (5th ed. 2013).

Providence Center psychiatrist, Dr. Husain, did a psychiatric evaluation.  Tr. 286-87.  On clinical interview, Plaintiff reported recent weight gain, poor sleep, and increased anxiety, which he attributed to limited contact with family and his bad living environment.  Tr. 286.  On mental status examination, Dr. Husain noted mild psychomotor retardation, depressed mood, sad affect, restricted thought process, and poor attention and concentration.  Tr. 287.  She diagnosed Plaintiff with major depressive disorder, anxiety disorder, and cocaine dependence (in remission), and assessed a GAF score of 50,[6] denoting serious symptoms or impairment.  Tr. 287.  She increased the Zoloft dose and encouraged him to continue therapy.  Tr. 287.

The mental health treating records for the balance of 2012 and 2013 are largely consistent.  At regular therapy appointments with Mr. Gonzalez, mental status findings include abnormalities of mood, speech and thought; for example, in September 2013, despite a notation that Plaintiff was making good progress, the examination includes findings of anxious mood, rapid speech and paranoid thoughts.  Tr. 388.  Similarly, Dr. Husain's mental status examinations consistently note anxious or depressed mood, and often include other abnormal findings.  Tr. 381-86.  For a short period in the spring of 2013, Dr. Husain noted improvement[7] with mental status findings largely normal.  Tr. 373.  However, by July 2013, she was again noting depressed, sad mood with poor sleep.  Tr. 381.  In September 2013, her notes reflect tearful affect, low energy, with abnormal findings of depressed mood and constricted affect; she increased his dose of medication.  Tr. 383.

---

[6] See n.5, *supra*.

[7] Consistent with a period of improvement, Providence Center staff assessed Plaintiff's GAF at 56, denoting moderate symptoms, DSM-IV at 34, in late February 2013, Tr. 313-14, but his GAF score was back down to 50 by September 2013.  Tr. 377.  Similarly, at a blood pressure check in March 2013, Dr. Lone did not note any abnormal mental status findings.  Tr. 319-20.

The PCMC mental status examinations for September 2012 through January 2013 are similar; they reflect serious psychiatric abnormalities, including (sometimes) decreased concentration, difficulty with activities of daily living, depression, anxiety and insomnia.  Tr. 225-26.  Dr. Epstein's notes for the second half of 2013 reflect constricted affect, depression, hopelessness, restlessness, moving or speaking slowly, anhedonia and low self-esteem, including her concern that the medication regime prescribed by Dr. Husain did not seem to be working. Tr. 403-26.

C.    **Opinion Evidence**

On May 29, 2012, with the Providence Center referral pending, the PCMC treating nurse practitioner, Nurse May, completed a Rhode Island Department of Human Services ("DHS") examination report, in which she opined that Plaintiff's anxiety, depression, hypertension, and tremors caused moderate limitations in the ability to make simple work-related decisions and marked limitations in the ability to remember and carry out simple instructions, to attend, concentrate and work at a consistent pace, and to respond to changes in work routine, coworkers and supervisors.  Tr. 216-19.

On December 7, 2012, SSA physician Dr. Erik Purins reviewed the available records and opined that Plaintiff's tremors were not severe because they were effectively managed with medication and did not manifest in cardiovascular or neurological deficits during objective examinations.  Tr. 56-57.

On January 8, 2013, Plaintiff underwent a psychological examination with consulting psychologist Dr. Jorge Armesto, who administered standardized intelligence and achievement tests, all of which indicated that Plaintiff's non-verbal IQ, math skills, and reading comprehension were significantly impaired, although Dr. Armesto noted that Plaintiff "presented

as a man who put forth minimal effort during testing" so that the tests likely did not represent Plaintiff's true cognitive abilities and skills.  Tr. 266-70.  On mental status examination, Dr. Armesto observed that Plaintiff appeared tired, sad, and guarded, and that his attention/ concentration and remote memory were impaired.  Tr. 268-69.  Dr. Armesto diagnosed Plaintiff with major depressive disorder (rule-out generalized anxiety disorder), an unspecified learning disorder, and borderline intellectual functioning, and assessed a GAF score of 48.  Tr. 269.  He opined that Plaintiff's "capacity for new learning appears to be impaired," but that the symptoms could improve in the next six months with proper mental health treatment.  Tr. 270.  He also noted that Plaintiff had "no work orientation" and would benefit from vocational rehabilitation services.  Tr. 270.

On January 10, 2013, SSA psychologist Dr. Marnee Colburn reviewed the available record and opined that Plaintiff's depression and anxiety caused moderate restrictions of activities of daily living, social functioning, and concentration, persistence, or pace, with no episodes of decompensation.  Tr. 57-58.  She concluded that Plaintiff could perform simple, untimed tasks, and could tolerate superficial contact with others and normal supervision, but would work best alone.  Tr. 58-60.  Following this review, the application was denied initially.

During the reconsideration phase, on May 16, 2013, SSA psychologist Dr. Michael Slavit opined that Plaintiff had only mild restriction of his activities of daily living and moderate difficulties in social functioning and maintaining concentration, persistence and pace, with no episodes of decompensation.  Tr. 70-74.  He concluded that Plaintiff could perform routine tasks on a full-time basis, and could tolerate brief, superficial interactions with others.  Tr. 71-74.  On June 7, 2013, SSA physician Dr. Meghana Karande reviewed the updated record and concluded

that Plaintiff had "no somatic functional limitations."  Tr. 69; <u>see</u> Tr. 194-99.  Reconsideration

was denied on June 10, 2013.

On June 24, 2013, treating psychiatrist Dr. Husain provided her first opinion; she

completed an RFC questionnaire opining that Plaintiff had "moderately severe" to "severe"

impairments in every sphere of mental functioning, except for personal habits.  Tr. 374-75.  She

identified the disabling impairments as "poor sleep, depressed mood, encreased [sic] anxiety,

encreased [sic] appetite, feeling hopeless and helpless."  Tr. 376.

On December 6, 2013, Plaintiff's treating physician, Dr. Epstein, signed an opinion

stating that Plaintiff was compliant with his medications and appointments, but was

"significantly limited in his ability to work because of [his] conditions, especially the depression

and tremor."  Tr. 411.  For mental functional limitations, her letter deferred to the Providence

Center but for physical limitations, she wrote that the "essential tremor . . . interferes with his

ability to hold objects and write despite active therapy for it."  Tr. 411.

On January 2, 2014, Dr. Husain completed a second mental RFC questionnaire, in which

she opined that Plaintiff is not limited in his ability to carry out very short and simple

instructions and to ask simple questions, but is moderately to markedly limited in every other

category of mental functioning and would miss more than three days of work per month and

cannot sustain full-time employment.  Tr. 392-97.

## II.     <u>Travel of the Case</u>

Plaintiff protectively filed for SSI on July 23, 2012, Tr. 136-44, 191, alleging that he had

been disabled since January 1, 2011, due to depression, high blood pressure, and an unspecified

mental illness, Tr. 169.  On January 31, 2014, Plaintiff appeared with an attorney and testified

through an interpreter at a hearing before the ALJ.  Tr. 40-52.  A vocational expert ("VE") also

testified.  Tr. 49-52.  On March 4, 2014, the ALJ issued a decision finding that Plaintiff was not

disabled.  Tr. 19-39.  That decision became final on October 13, 2015, when the Appeals Council

denied Plaintiff's request for review.  Tr. 1-6; see 20 C.F.R. § 416.1481.

## III.   Issues Presented

Plaintiff contends that the ALJ erred in her evaluation of and weight accorded the

opinions of the treating psychiatrist and treating nurse practitioner, and erred in her evaluation of

Plaintiff's credibility.

## IV.   Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence.

42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v.

Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v.

Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F.

Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by

substantial evidence, the Commissioner must be affirmed, even if the Court would have reached

a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819

F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991);

Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole.

Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d

192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also

must consider evidence detracting from evidence on which Commissioner relied).  Thus, the

Court's role in reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30.

The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of

the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148,

153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not

the courts."  Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  A claimant's

complaints alone cannot provide a basis for entitlement when they are not supported by medical

evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20

C.F.R. § 416.929(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies

incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that

the law was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam);

accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary

where all of the essential evidence was before the Appeals Council when it denied review, and

the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart,

276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four

of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences.

Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's

decision is not supported by substantial evidence, or that the Commissioner incorrectly applied

the law relevant to the disability claim.  Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621

F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but

also was insufficient for district court to find claimant disabled).  Where the Court cannot discern

the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001).  On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

## V.   **Disability Determination**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(I); 20 C.F.R. § 416.905.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 416.905-911.

### A.    **Treating Physicians and Other Sources**

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise.  See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 416.927(c).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 416.927(c)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is

unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).  The ALJ's decision must articulate the weight given, providing "good reasons" for the determination.  See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 416.927(c).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  See 20 C.F.R. § 416.927(c)(2).

A treating source who is not a licensed physician or psychologist[8] is not an "acceptable medical source."  20 C.F.R. § 416.913; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006). Only an acceptable medical source may provide a medical opinion entitled to controlling weight to establish the existence of a medically determinable impairment.  SSR 06-03p, 2006 WL 2263437, at *2.  An "other source," such as a nurse practitioner or licensed clinical social worker, is not an "acceptable medical source," and cannot establish the existence of a medically

---

[8] The regulations recognize other categories of providers as acceptable medical sources for certain impairments; for example, a licensed optometrist is acceptable for measurement of visual acuity and visual fields.  SSR 06-03p, 2006 WL 2263437, at *1.

determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function.  Id. at *2-3.  In general, an opinion from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist.  Id. at *5.  Nevertheless, the opinions of medical sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects, along with other relevant evidence in the file.  Id. at *4.

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 416.927(d).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity ("RFC"), see 20 C.F.R. §§ 416.945-946, or the application of vocational factors because that ultimate determination is the province of the Commissioner.  20 C.F.R. § 416.927(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

### B.      Making Credibility Determinations

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986); Rohrberg, 26 F. Supp. 2d at 309-10.  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at 195.

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

**VI.**  **Analysis**

**A.**  **Step Two Error**

At Step Two, the ALJ found that Plaintiff had various severe mental impairments (borderline intellectual functioning, major depressive disorder, learning disorder, and anxiety) but no physical impairments.  Tr. 27-28.  Specifically, in reliance on the June 2013 opinion of SSA reviewer Dr. Karande that Plaintiff had no somatic functional limitations," the ALJ found that all of Plaintiff's alleged physical impairments were non-severe.  In making this finding, she rejected Dr. Epstein's December 2013 opinion regarding the essential tremor, finding that Epstein opinion "is not supported by a reasonably precise functional assessment which is supported by clinical findings."  Tr. 28.

The latter finding is based entirely on the ALJ's lay assessment of Dr. Epstein's treating notes and opinion, since the documented "worsening" of Plaintiff's tremor, Tr. 402-22, occurred after the SSA file reviews.  To this Court's equally lay assessment, the ALJ seems to be completely wrong.  Far from omitting functional limits or lacking clinical findings, Dr. Epstein's longitudinal treating notes and her opinion are consistent and clear in recording the observation that the essential tremor had become so serious that it was interfering with Plaintiff's ability to

hold objects and write (resulting, for example, in his burning himself from a dropped container of hot chocolate), as well as her conclusion that the tremor was not responding to "active therapy." Tr. 402-22, 411-12. Moreover, had the ALJ found that the tremor posed a serious manipulative limitation, this conclusion would no doubt have affected the VE's opinion as to whether or not such a tremor would preclude work as a cafeteria attendant, packaging machine operator or even a driver – all potential jobs identified by the VE at the hearing. Tr. 35-36. Nevertheless, with all physical impairments, including the tremor, found to be non-severe at Step Two, the ALJ did not consider the tremor or any of the limitations that it caused in formulating her RFC determination.

It is well-settled that the Step Two determination is essentially a screening phase, intended to flag every impairment that might affect functionality. McDonald v. Sec'y of Health and Human Services, 795 F. 2d 1118, 1122 (1st Cir. 1986); Charpentier v. Colvin, No. CA 12-312 S, 2014 WL 575724, at *12 (D.R.I. Feb. 11, 2014) (Step Two definition of "severe" is a *de minimis* policy, designed to do no more than screen out groundless claims). In this Circuit, courts routinely label as error an ALJ's failure to find severe an impairment that is medically established and that causes some functional impact. Courtemanche v. Astrue, CA-10-427M, 2011 WL 3438858, at *15 (D.R.I. July 14, 2011). To the extent that an impairment is wrongly omitted but analysis proceeds and the symptoms and functional limitations caused by the impairments are considered in formulating the RFC, such error is harmless. Syms v. Astrue, 10-CV-499-JD, 2011 WL 4017870, at *1 (D.N.H. Sept. 8, 2011) ("[A]n error at Step Two will result in reversible error only if the ALJ concluded the decision at Step Two, finding no severe impairment."). However, if the erroneous rejection of an impairment that causes some functional impact causes all consideration of those limitations to end at Step Two, the error is material

requiring remand.  Id.; see Charpentier, 2014 WL 575724, at *13 (remand required when all mental health limitations rejected at Step Two so that they were not further considered in development of RFC).

I find that the ALJ's error at Step Two – rejecting Dr. Epstein's opinion regarding the essential tremor and finding it to be non-severe, thereby ending consideration of the limitations that it caused – is material.  Plaintiff has presented an opinion from an acceptable treating source, which appears to be is consistent with the contemporaneous medical record and supported by clinical observations, and which specifically describes serious functional limitations (holding objects and writing).  Tr. 411.  The treating record makes clear that the tremor is an impairment that worsened after Dr. Karande reviewed the file, so that her reviewing opinion does not amount to substantial evidence supporting the ALJ's decision to reject it.  If Plaintiff cannot hold a cup of hot chocolate, it is difficult not to conclude that the VE's testimony that he could work (for example) as a cafeteria attendant would be different.  Under these circumstances, the ALJ's Step Two error requires remand.

The vexing issue is that Plaintiff did not present this argument.  He did not challenge any aspect of the ALJ's Step Two finding and he mentions Dr. Epstein's opinion only with respect to her findings regarding depression.  Because I find that the ALJ's error in ignoring the functional limitations caused by Plaintiff's essential tremor is sufficiently serious as to affect justice, I recommend that this Court remand the matter for further consideration of whether the essential tremor is a severe impairment.  Silva v. Colvin, CA 14-301S, 2015 WL 5023096, at 13 (D.R.I. Aug. 24, 2015) ("it is also clear that this Court may, and should, raise issues *sua sponte* when the review of the record suggests that justice requires it").

**B.     RFC Error**

In formulating her RFC determination regarding the limitations caused by Plaintiff's mental impairments, the ALJ gave "considerable weight" to the opinions of the SSA psychologist, Dr. Slavit, but rejected a host of treating opinions,[9] giving "limited probative weight" to the two opinions of the treating psychiatrist, Dr. Husain, "limited weight" to the opinion of treating primary care physician, Dr. Epstein and "minimal probative weight" to the opinion of the treating nurse practitioner, Nurse May.  Tr. 34.  Focusing principally on the treating psychiatrist, Plaintiff argues that her two opinions are consistent with the treating notes and the records and opinions of other treating sources and are well supported by appropriate clinical observations and findings; as a longitudinal treating source with specialized expertise in the area of her opinion, Plaintiff argues that the ALJ should have afforded them controlling weight pursuant to 20 C.F.R. 404.1527(d)(2) and 416.927; see SSR 96-2p(6) ("if a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it *must* be given controlling weight; *i.e.*, it must be adopted").

The ALJ afforded both of Dr. Husain's opinions limited weight because she found them "not consistent with, or supported by, the evidence as a whole." Tr. 34.  To buttress this finding, the ALJ reviewed the Providence Center treating notes, primarily those of Dr. Husain herself.  Tr. 31.  To begin, the decision focuses on Dr. Husain's treating note of July 23, 2013, which is contemporaneous with her opinion; the ALJ concludes that it is inconsistent because the mental status is unremarkable, Zoloft was discontinued and Plaintiff reported that he spent time with friends.  Tr. 31.  Except for Plaintiff's report of spending time with friends, this is inaccurate or misleading: Dr. Husain's mental status examination actually noted both abnormal mood

---

[9] It is significant that all of Plaintiff's primary treating providers, both primary care and mental health, provided consistent opinions that he suffers from work-preclusive limitations.  The only one who did not supply an opinion is the therapist, Mr. Gonzalez; however, his treating notes are entirely consistent with the opinions of Dr. Husain, Dr. Epstein and Nurse May.

(depressed) and affect (constricted) and, while she did discontinue Zoloft, she also increased Wellbutrin.  Tr. 381.  Next, the ALJ focused on Dr. Husain's September 2013 appointment, describing it as resulting in unremarkable mental status.  Tr. 31.  The ALJ is right that this appointment represents the apex of Plaintiff's condition – he reported feeling less stressed, bicycling and spending time with friends.  Tr. 383.  Nevertheless, Dr. Husain's mental status findings were not "unremarkable," as the ALJ stated, Tr. 31, in that Dr. Husain still noted that Plaintiff had an anxious mood.  Tr. 383.  And at the next appointment in November 2013, far from an unremarkable mental status, as the ALJ found, Tr. 31, the treating record reflects the return of abnormal symptoms, including constricted affect, depressed mood, sleep disturbance and decrease in energy level.  Tr. 385.  Further, while the ALJ was right that the related therapy notes reflected "good progress," the same notes also include consistent abnormal mental status findings, including agitated behavior, anxious mood, rapid speech and paranoid thought content. Tr. 388.

A survey of the treating record reveals the error in the ALJ's finding that Plaintiff's "mental status examinations have for the great majority of times been within normal limits/unremarkable/showed no significant abnormalities."  Tr. 33.  Rather, apart from a period in the spring of 2013, Tr. 319-20, 373, all of Plaintiff's mental status examinations include abnormal findings consistent with Dr. Husain's opinions.[10]  Further, both Dr. Armesto's consulting report, which found that Plaintiff was impaired in his ability to respond to customary

---

[10] Similarly, the ALJ's deployment of the GAF scores amounts to improper cherry picking, in that she relies on the two scores assessed by the Providence Center staff in the moderate range, (GAF of 55 in August 2012 and GAF of 56 in February 2013, both assessed by Providence Center staff in treatment plan updates), Tr. 309, 313, while giving "limited probative weight," Tr. 33, to the GAF scores reflecting serious impairment also assessed by the Providence Center staff (GAF of 45 at intake and GAF of 50 in the second 2013 treatment plan), as well as the GAF of 50 by Dr. Husain in her psychiatric evaluation, and by the consulting psychologist, Dr. Armesto (GAF of 48).  Tr. 269, 285, 287.  With no principled basis for crediting the moderate GAFs and discounting the GAFs denoting serious impairment, it is error for the ALJ to rely on the higher GAF scores as substantial evidence inconsistent with Dr. Husain's opinions.

work pressures, socially isolated, and that his "capacity to concentrate in a consistent manner is impaired," and Dr. Epstein's letter opinion, which noted that "significant depression" limited his ability to work, are consistent with Dr. Husain's opinions.  Tr. 266-70, 411.  Finally, Nurse May's treating notes and opinion of May 2012 are also consistent in finding that Plaintiff had serious anxiety disorder and depression that caused marked limitations in his ability to work.[11] Tr. 218.  The only contrary findings are the SSA opinions, which are inconsistent with each other as well as with the treating record.  Compare Tr. 57 (Dr. Colburn finds affective disorder severe borderline intellectual function non-severe), with Tr. 70 (Dr. Slavit finds affective disorder non-severe, but borderline intellectual function severe).

Based on the foregoing, I find that the ALJ erred in affording limited probative weight to Dr. Husain's opinions and minimal probative weight to Nurse May's opinion.  Accordingly, I recommend that this Court remand the matter for further consideration of Plaintiff's RFC in light of these opinions.

### C.     Credibility

The final task is the ALJ's adverse credibility finding.  Here too, I find error in the ALJ's determination that Plaintiff's statements were "not entirely credible."  Tr. 32.  The ALJ's primary "specific and adequate reason," Auger v. Astrue, CA 09–622S, 2011 WL 846864, at *8 (D.R.I. Feb. 3, 2011), for her credibility finding is the determination that Plaintiff's descriptions of his depression and anxiety were "not supported by the weight of the medical evidence to the

---

[11] Although the ALJ properly noted that Nurse May is not an acceptable medical source, as a treating provider involved with Plaintiff's care throughout the period of alleged disability, her opinions are worthy of some consideration because they are consistent with the other treating records and are supported by relevant evidence, including her own mental status evaluations.  Tr. 231-34, 238-41.  The ALJ's decision to afford them minimal weight was based on the erroneous conclusion that they are inconsistent with the longitudinal record, as well as on their inconsistency with the opinions of the SSA psychologists.  Tr. 34.  The Commissioner conceded that Nurse May's opinions were generally consistent with Dr. Husain's so that the argument that they should have been afforded greater weight should resonate if Dr. Husain's are found to be supported by and consistent with the objective medical findings.  With a remand required to consider Dr. Husain's opinions, I also find that Nurse May's opinion should be reweighed on remand.

degree alleged."   The ALJ also relied on her determination that Plaintiff's self-described symptoms were at odds with his acknowledgement that he was able to perform a number of activities, including hygiene and grooming, household finances, watch television, shop, prepare food, occasionally spend time with friends, and bicycling.  Tr. 33.  However, these "reasons" are based on the same flawed analysis that caused the ALJ to reject the opinions of the treating providers.  Plaintiff's psychiatrist, primary care physician and treating nurse practitioner were all fully aware of Plaintiff's supposedly inconsistent activities and lack of psychiatric hospitalizations and yet all three opined that Plaintiff's symptoms caused limitations amounting to disabling mental illness.  Tr. 28.  Plaintiff's own descriptions of these activities to the mental health treating sources and in connection with his application are consistent and relatively uncontradicted, other than his denial at the hearing that he has had friends.  See Tr. 47.  This deficit leaves the ALJ's rejection of Plaintiff's credibility without "specific and adequate reasons" based on the record and requires remand unless the error is deemed harmless.  See DeRosa, 803 F. 2d at 26; Charpentier, 2014 WL 575724, at *11 (ALJ "must articulate specific and adequate reasons" for failing to give credence to claimant's testimony).

Ironically, this record contains other reasons to discount Plaintiff's credibility, none of which are mentioned by the ALJ.  For example, at the hearing, Plaintiff was insistent that his back pain is disabling, yet there is no medical evidence to support the claim.  Further, the record is loaded with references to Plaintiff's inability, perhaps based on his intellectual impairment, effectively to communicate about his medical history and symptoms; this evidence could constitute a reason to discount the credibility of any statement affected by this limitation.  Tr. 158, 231, 266, 286-87.  However, while it might seem unnecessary to remand a case when the Court can concoct its own reasons to come to the same result as that reached by the ALJ's flawed

credibility decision, it is not the function of this Court to replace the ALJ.  <u>Charpentier</u>, 2014 WL 575724, at *16.  In light of the other issues requiring remand of this matter, I also recommend that the Court remand for further evaluation of the credibility determination.

**VII.**  **<u>Conclusion</u>**

Based on the foregoing analysis, I recommend that Plaintiff's Amended Motion to Reverse the Decision of the Commissioner (ECF No. 14) be GRANTED and Defendant's Motion for an Order Affirming the Commissioner's Decision (ECF No. 15) be DENIED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  <u>See</u> Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  <u>See</u> <u>United States v. Lugo Guerrero</u>, 524 F.3d 5, 14 (1st Cir. 2008); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
September 2, 2016